USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/3/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDER KASZOVITZ LLP,

Plaintiff,

-against-

LEE S. ROSEN,

Defendant.

---

No. 17-cv-2954 (CM)

**MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

McMahon, C.J.:

This case arises from a fee dispute between a law firm, Feder Kaszovitz LLP ("Feder"), and its former client, Lee Rosen. Feder seeks to recover Rosen's non-payment of his legal bills. It asserts claims of breach of contract, account stated, and quantum meruit. Defendant asserts counterclaims of breach of contract and fraud in the inducement.

Plaintiff now moves for summary judgment on its breach of contract and quantum meruit claims. For the reasons stated below, Plaintiff's motion is GRANTED, with further proceedings to follow.

### FACTS

The facts of this case are not disputed unless otherwise noted.

*The Retainer Agreement*

In August 2013, Alpha Capital Anstalt filed a lawsuit in this district against Rosen and others, alleging, among other things, that Rosen had committed securities fraud. *See Alpha Capital*

1

*Anstalt v. New Generation Biofuels & Lee Rosen,* No. 13 Civ. 5586 (VEC) (S.D.N.Y. Aug. 9, 2013), Dkt. No. 1 (the "Alpha Capital lawsuit"). (Decl. of David Richan ("Richan Decl.") ¶¶ 6-7, Dkt. No. 32.)

Rosen met with one of Feder's partners, Murray Skala, to discuss the Alpha Capital lawsuit. (Decl. of David Sack ("Sack Decl."), Ex. E ("Rosen Dep.") 9:21-10:4, Dkt. No. 26-6.) Rosen ultimately agreed to engage Feder to represent him in the Alpha Capital lawsuit. In connection therewith, the parties executed a retainer agreement, dated October 17, 2013 (the "Retainer Agreement"). (Sack Decl., Ex. F, Dkt. No. 26-7.) It is a fairly standard New York State attorney retainer agreement. It describes the work to be done ("representing you as a defendant in the [Alpha Capital] matter"), and provides for a small upfront payment ($7,500) against compensation at the hourly rate of attorneys assigned to the matter times actual hours worked, with bills to be rendered periodically. The retainer agreement that the parties signed contains no cap on fees and includes no estimate of either the cost of performing any task or the overall cost of the representation. It does not contain a standard "merger clause" (that is, a clause worded more or less as follows: "This document represents the entire agreement between the parties and supersedes all prior discussions and representations..."); but it states that the agreement reflects "our understanding of the scope of our representation and the terms of our arrangement."

There were apparently discussions between the parties about the cost to Rosen of dealing with the Alpha Capital lawsuit before the Retainer Agreement was signed. The parties agree on two details about those conversations: that Rosen hoped his lawyers would "piggyback" on work performed for other defendants in the lawsuit (Rosen Dep. 14:12-22); and that the word "cap" was never mentioned prior to the signing of the retainer agreement (Skala Dep. 23:22-24:15; Rosen Dep. 23:10-13.) Otherwise they do not agree what was said. In fact, between the complaint and

2

his deposition testimony, Rosen himself has taken different positions about exactly what he and Skala said to each other.

Ultimately, none of that is of any moment, since the parties entered into a written retainer agreement governing the terms of their arrangement.

*The Dispute that Led to This Lawsuit*

Needless to say, defending against the Alpha Capital lawsuit cost a lot more than Rosen had hoped to pay.

On December 5, 2013, Plaintiff filed a motion to dismiss the complaint in the Alpha Capital lawsuit. (Richan Decl., Ex. F., Dkt. No. 32-6.) Skala sent Defendant a letter, dated December 17, 2013, informing Defendant that Plaintiff had filed the motion on his behalf. The letter indicated that Feder had not been able to "piggyback" on the other defendants' work, as both Rosen and Skala had hoped to do. Skala explained both why that proved impossible and what Feder actually had to do in order to prepare papers on Rosen's behalf. (Richan Decl., Ex. G, Dkt. No. 32-7.)

Attached to the letter was an invoice for work performed, plus disbursements, through November 30, 2013. The total time charges and disbursements totaled $87,231.69. On the bill, Feder gave Rosen immediate credit for the $7,500 retained (per the terms of the retainer, it was to have been applied against the final bill, not the first bill). The firm also offered Rosen a "courtesy discount" of 20% of its time charges ($16,934), as well as the option to defer payment of another $25,000 until the case was dismissed or settled. This left an amount due and immediately payable of $45,000.00, against a total amount (less retainer and 20% discount) of $70,000. (Richan Decl. Ex. H, Dkt. No. 32-8.) Skala's cover letter indicated that the write-off and the deferral of payment were conditioned on prompt payment of the $45,000.

3

When Rosen received Skala's letter and the invoice, he "freaked out." (Rosen Dep. 27:3-23.)

Lawyer and client met in January 2014. (Richan Decl. ¶ 25; Rosen Dep. 32:5-9.) By that time, Alpha Capital had responded to the defendants' multiple motions to dismiss by filing an amended complaint. The amended complaint was much longer than the original; it also included new allegations against Rosen personally. This meant that the entire exercise had to be repeated, that the first motions were for naught; there would be a second round of motions to dismiss, and that new issues and arguments would have to be addressed. All this was discussed. Apparently the parties also discussed the possibility of filing a motion for sanctions.

The parties do not agree about the substance of their January discussion insofar as it related to fees. According to Rosen, ("Skala Dep.") 67:4-16, Dkt. No. 32-2.) Skala agreed to "cap [Plaintiff's] fees at $45,000, *including the second motion [to dismiss]*." (Rosen Dep. 32:10-22.) Skala, in a follow-up email sent to Rosen in order to memorialize the January meeting, characterized the fee discussion rather differently:

> I told you when we met that we would be prepared to cap our fees *for the next motion to dismiss round.* I indicated that we would be willing to cap our fees at $45K, but that would not include time in connection with a motion for sanctions, should you so wish to proceed. Upon further consideration, we would be prepared to include the work on the motion for sanctions as falling within the above cap. Also, please send us the payment that you said that we would be receiving last week; it would be much appreciated.

(Sack Decl. Ex. H, at 2, Dkt. No. 26-9) (emphasis added).

While Rosen insists that this email places an absolute limit of $45,000 on fees for past and future work (Richan Decl. ¶ 30; Rosen Dep. 34:23-35:9.), I cannot agree with his characterization, or conclude that it raises a disputed issue of fact. Skala's email clearly states that (1) there was going to be a second round of motions to dismiss; (2) Skala had originally promised to "cap our fees *for the next motion to dismiss round* . . . at $45K; (3) in their original conversation, that cap

4

did not include work on a motion for sanctions; but (4) on sober reflection, Feder had decided to include work performed on any sanctions motion within that $45,000 cap – which is to say, $45,000 for the work on both the second motion to dismiss and the sanctions motion. Skala's email said nothing about including work on the first motion to dismiss within the cap, or about capping fees for the entire representation at $45,000. There is no way to read the email as saying anything of the sort. Indeed, on Rosen's reading, Feder would essentially have been agreeing to perform all future work on the case for free, as well as to write off the $20,000 that it had agreed to defer when it issued the first invoice. Nothing in Skala's email suggests any such "agreement."

Rosen did not respond to Skala's email with some writing of his own, protesting that it did not reflect their conversation. Neither did he fire his lawyers. Instead, he paid $25,000 against the $45,000 invoice on February 22, 2014, and another $10,000 on or about May 19, 2014 – a total of $42,500 out of the $45,000 due on the first invoice.

During that period, the firm continued to work on Rosen's behalf. Feder filed a motion to dismiss the amended complaint in the Alpha Capital lawsuit on March 20, 2014. (Richan Decl. ¶ 31.) Reply papers were filed in May. *See Alpha Capital Anstalt,* 13 Civ. 5586, ECF No. (S.D.N.Y. Aug. 9, 2013), Dkt. No. 50.

Having completed work on the second motion to dismiss, Skala sent Rosen a letter, dated June 10, 2014, attaching an invoice for services rendered from March 1 to May 31, 2014. Although the firms' time records revealed over $53,000 in time actually expended on the second motion to dismiss (substantially less that was expended on the first motion to dismiss), the invoice only charged $48,000.00 – $45,420 in fees and the rest in disbursement. This reflected another 15% courtesy discount, which brought the bill to almost exactly the $45,000 cap that Skala had proposed for Round Two. In his cover letter, Skala noted that, "While we appreciate that from your

5

perspective this has already been more expensive than you anticipated, we trust you appreciate the work that has been done and the need for us to be paid for our work." (Richan Decl. Ex. N, Dkt. No. 32-14.)

Skala followed up with an email dated June 30, 2014, asking for payment of Feder's outstanding invoice. Rosen responded the next day:

> We have a big problem. I was EXTREMELY clear when we met at my house that originally I would only spend 25,000 on the case. The first bill came and I ended up spending 32,500 and was VERY clear that I would only spend an additional 10,000 . . . . I have no intention and no where with all [sic] to pay your bill.

(Richan Decl., Ex. O, Dkt. No. 32-15.)

Skala responded to Rosen as follows: "If the discounts are not acceptable, and you are not willing to have our outstanding invoice (for $48,000.00) paid, then we will seek to recover the fair and reasonable value of our services (quantum meruit) which we believe is substantially higher than our outstanding invoice." (Richan Decl., Ex. P, Dkt. No. 32-16.)

Summer passed with no resolution of the parties' fee dispute. On September 4, 2014, Skala sent Defendant a letter, stating that Defendant's nonpayment "leaves us no choice but to take appropriate legal action." (Richan Decl. Ex. Q, Dkt. No. 32-17.) Attached to the letter was an invoice for all legal services rendered from the start of Plaintiff's representation of Defendant through May 31, 2014, plus disbursements through July 31, 2014. The invoice, which no longer reflected any discounts (either the 20% courtesy discount that had been reflected on the face of the first invoice or the 15% courtesy discount on the second invoice). It indicated that Plaintiff had provided a total of $187,477.75 in legal services (which was substantially more than the total time charges reflected on the two invoices – $140,667.44), and had incurred a total of $15,680.38 in disbursements (three times the total of $5,349.44 that is reflected on the two invoices). This final invoice noted that Defendant had made three payments (including his $7,500 retainer), totaling

6

$42,500.00, toward Feder's bills. It demanded a balance of $160,658.00. (Sack. Decl. ¶¶ 16-17.) Doing the math, it seems that Feder added back in the $20,000 deferred payment from the first invoice.

Rosen "laughed" when he received the invoice, and called Skala to discuss it. (Rosen Dep. 38:18-40:4.) Their discussion did not yield any resolution. So Rosen fired Feder and retained new counsel, who participated in discovery and ultimately settled Alpha Capital's claims against Rosen. (Rosen Dep. 40:9-12; 44:21-45:6.) He made no further payment to Feder.

Feder commenced this lawsuit on April 24, 2017, seeking the outstanding balance of the September 2014 invoice, or $160,658.00. (Compl., Dkt. No. 1.) Rosen filed his Answer on June 26, 2017, and asserted counterclaims of $100,000.00 in damages for breach of contract and fraud in the inducement. (Answer, Dkt. No. 13.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether any disputed issue of material fact exists is for the court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). At summary judgment, the court must construe the evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor. *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

Not every factual dispute will preclude summary judgment. A fact is material "when it might affect the outcome of the suit," *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and a genuine dispute requires "evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

7

To defeat summary judgment, the non-movant must support the existence of an alleged genuine dispute of material fact by citing materials in the record that would be admissible in evidence. Fed. R. Civ. P. 56(c). If the non-movant fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" at trial, then summary judgment will be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

II. **Breach of Contract**

Under New York law, a plaintiff asserting breach of contract must prove: (1) existence of a contract; (2) adequate performance by the plaintiff; (3) breach by the defendant; and (4) damages. *Eternity Glob. Master Fund Ltd v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

The parties do not dispute that the Retainer Agreement is a valid contract, or that Feder performed legal services for Rosen as required by the contract. They also agree that Defendant has failed and refused to pay Plaintiff any more than $42,500.00.

Feder seeks summary judgment for the balance it alleges is due – $160,658 – on the ground that, even viewing the evidence in Rosen's favor, Defendant breached the Retainer Agreement.

Rosen points to two issue of fact as to which he says there is genuine dispute.

1. **The Alleged Prior Oral Agreement Between Defendant and Skala**

First, Rosen argues that the parties orally agreed, prior to the signing of the Retainer Agreement, that Rosen would have some cap on the cost to him of defending against the Alpha Capital suit. He variously says that he insisted he would only have to pay $25,000 defending the Alpha Capital lawsuit; that Skala represented it might cost as much as $50,000 to get the lawsuit dismissed; and that he signed the retained agreement on the understanding that he would have to pay between $25,000 and $50,000. Skala of course denies that any of this was said, but Rosen's

8

argument must be rejected because it is inconsistent with the utterly unambiguous terms of the Retainer Agreement that he, Rosen, signed.

Under New York law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). The best evidence of the parties' intent is the contract itself. *See Eternity Glob.*, 375 F.3d at 177. Where "parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). In such a case, the "parol evidence rule forbids proof of extrinsic evidence to contradict or vary the terms of a written instrument and, accordingly, one who seeks, in a breach of contract action, to enforce an oral representation or promise relating to the subject matter of the contract cannot succeed." *Sabo v. Delman*, 3 N.Y.2d 155, 161 (1957). Therefore, if the parol evidence rule applies, Skala and Defendant's prior conversations are inadmissible as evidence to interpret the Retainer Agreement's fee provision.

The first step in determining whether the parol evidence rule applies is deciding whether the Retainer Agreement is an integrated contract. *4Kids Entm't. Inc. v. The Upper Deck Co.*, 797 F. Supp. 2d 236, 245 (S.D.N.Y. 2011). A contract is integrated "when the parties intend it to constitute the complete and final expression of their agreement," *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999), and it "appears complete on its face," *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000). Finding that a contract is integrated is "particularly appropriate" when the agreement contains an express merger clause. *Inv'rs Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990). However, where it is apparent from the face of a contract that it represents the parties' entire understanding, no formal merger clause is necessary in order to conclude that the agreement is integrated. *See*

9

*Bourne v. Walt Disney Co.,* 68 F.3d 621, 627 (2d Cir. 1995) (explaining that, in the absence of a merger clause, the court must "read the writing in light of the surrounding circumstances" to determine whether the parties intended the agreement to be an integrated writing); *see also 4Kids Entm't, Inc.*, 797 F. Supp. 2d at 245 ("The absence of a merger clause does not conclusively demonstrate that an agreement is not integrated."); *Battery Steamship Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 738 n.3 (2d Cir. 1975) ("[A] contract which appears complete on its face is an integrated agreement as a matter of law.") (citing *Higgs v. De Maziroff,* 263 N.Y. 473, 478 (1934)).

When an agreement is not integrated, however, the parol evidence rule does not apply. *Starter*, 170 F.3d at 295.

The Retainer Agreement in this case is an integrated agreement. Its plain language demonstrates that it is the complete expression of Plaintiff and Defendant's agreement. *See* Sack Decl. Ex. F, at 1 ("This letter sets forth our understanding of the scope of our representation and the terms of our arrangement."). It identifies the work to be done; explains how that work will be billed, and sets forth a dispute resolution mechanism. No term of the parties' agreement is left unexpressed.

I disagree with Defendant that the Retainer Agreement is "incomplete" because it does not set out a cap Plaintiff's fees. The law imposes no such requirement: "A price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount to the future, or contains no computational formula." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989). This particular contract clearly lays out Plaintiff's fee structure: payment of an initial retainer, followed by billing for every hour of time expended at specified hourly rates. It contains a plain and easily understood statement of the computational formula that will be used to charge for Feder's work: number of hours worked times hourly rates. It identifies

10

the rates charged by certain lawyers who would be performing under the contract (Skala and Jonathon Honig), and it notes that other lawyers who might work on the matter would charge hourly rates of between $185 and $425 per hour. It also describes the type of disbursements for which Rosen would be charged. There is no indication in the Retainer Agreement that the parties agreed to any cap, and Rosen signed the document knowing full well that it did not include any fee cap.

That is the arrangement to which the parties agreed. Rosen's proposed parol evidence about a prior agreement containing a cap on his fees would make a sham of the written agreement and impose an entirely different fee structure on the parties' express arrangement. His proposed testimony would vary the terms of an integrated written agreement. It is, therefore, inadmissible.

Of course, even if an agreement is integrated, a court may consider extrinsic evidence where the language in question is ambiguous. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992). Rosen urges me to find that the Retainer Agreement's fee provision is ambiguous because it does not provide a total fee amount.

But there is nothing ambiguous about the fee arrangement set forth in the retainer agreement.

Ambiguity is a question of law to be resolved by the court. *See W.W.W.*, 77 N.Y.2d at 162. Terms are ambiguous where they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997). "The language of a contract is not made ambiguous simply because the parties urge different

interpretations," *Seiden*, 959 F.2d at 428, and extrinsic and parol evidence is inadmissible to create ambiguity where none exists, *W.W.W.*, 77 N.Y.2d at 163.

If the terms are "clear and unambiguous, courts do not look beyond the four corners of the agreement, and parol evidence of the parties' intentions is inadmissible." *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33 (N.Y. 2002); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).

The written terms of the Retainer Agreement are not capable of more than one meaning when viewed objectively by a reasonably intelligent person – especially a sophisticated businessman (as Rosen was) who is familiar with the standard practices used in the retention of legal services (which have for decades been charged as a time charge applicable to a particular lawyer times the number of hours that lawyer worked). Defendant's suggestion that the agreement's failure to set a maximum fee renders it ambiguous suffers from a fatal flaw: under New York law, "silence does not equate to contractual ambiguity." *Greenfield*, 98 N.Y.2d at 573; *see also Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 126 (S.D.N.Y. 2015) ("Silence, or omission of a term, however, does not generally create ambiguity."). The Retainer Agreement requires Rosen to pay Feder for legal services rendered, applying to the number of hours actually worked specified hourly rates that are subject to periodic adjustment by Feder. The agreement does not set a cap; it does not contemplate a cap. All of that is clear and unambiguous.

Because I find the Retainer Agreement to be integrated, and the fee provision to be unambiguous, the parol evidence rule bars consideration of any alleged prior understanding between Defendant and Skala that would contradict or vary its terms. Rosen's parol evidence does not create any genuine issue of material fact; the contract says what it says.

## 2. The Alleged Modification of the Retainer Agreement in January 2014

The more complicated question is whether the retainer agreement was modified in early 2014. This issue is relevant because it is relevant to how much Rosen must pay Feder.

Sadly for Rosen, the agreement was not modified. It easily could have been – but it was not.

As noted above, once the amended complaint was filed and the landscape changed, the parties met to discuss their relationship. The record reveals that, in an email dated February 4, 2014, Skala, on behalf of Feder, offered to cap the firm's fees for filing a second motion to dismiss, together with any sanctions motion that might be filed (none was), at $45,000. As discussed above, Rosen is not correct that Skala agreed to cap the fee for the entire representation at $45,000; there is no way to read the email as saying any such thing. The communication that could not be clearer:

> . . . we would be prepared to cap our fees *for the next motion to dismiss round.* I indicated that we would be willing to cap our fees at $45K, but that would not include time in connection with a motion for sanctions, should you so wish to proceed. Upon further consideration, we would be prepared to include the work on the motion for sanctions as falling within the above cap.

(Sack Decl. Ex. H, at 2, Dkt. No. 26-9) (emphasis added).

The parties' different understanding of the meaning of Skala's email ends up answering the question of whether the agreement was modified. Since they do not agree about what the email means, there was no meeting of the minds. Therefore, the agreement was not modified.

New York law is clear: parties may modify a written contract by subsequent oral agreement, subject to the statute of frauds,[1] especially if the agreement does not specifically prohibit oral modification – which the Retainer Agreement in this case does not. *See Rose v. Spa*

---

[1] The statute of frauds is not applicable here because the proposed modification – work on the second motion to dismiss – was capable of being performed within a year – and indeed, was performed between February and May of 2014

13

*Realty Assocs.*, 42 N.Y.2d 338, 343–44 (1977). However, a party seeking to prove modification must submit "proof of each element requisite to the formulation of a contract," including mutual assent to its terms, *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003), as well as valid consideration, *Baraliu v. Vinya Capital, L.P.*, 765 F. Supp. 2d 289, 298 (S.D.N.Y. 2011).

In this case, there is no proof of the most essential elements of contract formation: mutual assent.

"To form a binding contract there must be a meeting of the minds, such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Stonehill Capital Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016). Were there any indication in the record that Rosen assented to Skala's proposed modification of the retainer agreement, I would readily conclude that the clearly stated terms of Skala's February 4 email worked a modification. And I would hold that Feder was only entitled to recover $45,000 for its work on the second motion to dismiss.

However, Rosen absolutely refuses to concede that the email says what it clearly says. He insists that the email means that Skala agreed, on behalf of Feder, to cap the fees for work done in connection with both motions to dismiss at $45,000. As there is no rational way to read Skala's words as Rosen does, I am constrained to conclude that he did not assent to Skala's proposed modification of the Retainer Agreement – there was no meeting of the minds. So the email is simply an offer to modify the contract. Because the offer was not accepted, Rosen find himself in the position of having agreed to pay Feder for the work performed on the second motion in accordance with the written agreement he signed.

14

Additionally, even if there had been mutual assent to the terms of the modification, Rosen has not shown that it was supported by adequate consideration. *See Tierney v. Capricorn Inv'rs, L.P.*, 189 A.D.2d 629, 631 (1st Dep't 1993) ("Neither a promise to do that which the promisor is already bound to do, nor the performance of an existing legal obligation constitutes valid consideration."). On the record before the Court, the only possible consideration for the modification proposed by Skala would have been Rosen's abandonment of the argument that his fees should be capped at $45,000 for the entire representation. Rosen had not conceded that to this day. Neither side has identified any other consideration that Rosen offered or was in a position to offer in exchange for Skala's agreement to modify the Retainer Agreement by capping his fee for the second motion to dismiss at $45,000.

In short, the undisputed facts show that the original Retainer Agreement did not cap Feder's fees and that the parties did not modify it in order to cap the fees. Therefore, Rosen's refusal to pay Feder the fees due pursuant to the terms of the retainer agreement means that he has breached the Retainer Agreement.

And Plaintiff is entitled to summary judgment on its breach of contract claim.

The question becomes: summary judgment in what amount?

I fear that the amount due is not obvious from the parties' submissions. Feder insists that it is the amount of its last and final invoice – approximately $160,000 – but it appears to the Court that Rosen substantially complied with the demand for payment of the $45,000 first invoice – having paid all but $2,500 of that amount – such that it would not be appropriate for the Court to revoke the $16,933 courtesy discount that was voluntarily given Rosen by Feder in connection with that first bill. Feder's last invoice of course eliminates that discount. The parties have not addressed that issue at all in their papers.

The dispute resolution mechanism in the Retainer Agreement calls for any fee disputes that are not submitted to arbitration in accordance with the Rules of the Chief Administrator to be resolved in New York County without a jury. (Sack Decl., Ex. F at 3, Dkt. No. 26-7.) Since the Court is the trier of fact, I direct the parties to come up with a mechanism for addressing the issue of damages for Rosen's breach – which can include an inquest before a United States Magistrate Judge. If the parties cannot agree, they will be on 48 hours' notice for a damages trial before me.

III. **Quantum Meruit**

Plaintiff also has moved for summary judgment on its quantum meruit claim.

Under New York law, quantum meruit is analyzed as a quasi contract claim. *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). In order to recover on a quasi-contract claim, Plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.* (internal quotation marks omitted) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)). However, "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987).

The Court has already concluded that the Retainer Agreement is a valid and binding contract. Plaintiff's quantum meruit claim arises from the exact same facts as its breach of contract claim. Since Plaintiff will recover damages on its breach of contract claim, it cannot recover for a second time under a theory of quantum meruit. The second cause of action is dismissed.

## IV. The Parties' Remaining Claims

Plaintiff's claim for account stated is dismissed *sua sponte*. A claim for account stated "cannot be made an instrument to create liability, nor may it be utilized simply as another means to attempt to collect under a disputed contract." *4Kids Entm't, Inc.*, 797 F. Supp. 2d at 249. Plaintiff's account stated claim is entirely duplicative of its breach of contract claim.

What remains of this case, then, are Rosen's counterclaims. As neither side has sought summary judgment on the counterclaims, the Court will not grant it *sua sponte* – though I note that a court may grant summary judgment to a non-moving party if, upon reviewing the record, summary judgment is warranted. *See Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 347 (S.D.N.Y. 2009). This is especially true where "the court's *sua sponte* determination is based on issues identical to those raised by the moving party. Absent some indication that the moving party might otherwise bring forward evidence that would affect the court's summary judgment determination, failure to provide an opportunity to respond is not reversible error." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991).

It appears to me that the resolution of Feder's motion for summary judgment with a finding of breach by Rosen necessarily means that the counterclaims must be dismissed – especially because Rosen's fraudulent inducement counterclaim appears to rest on the same inadmissible parol evidence that had to be ignored in connection with Feder's breach of contract claim. However, I insist that the parties make a proper presentation, properly supported, before I will address the counterclaims.

## CONCLUSION

For the reasons stated above, Plaintiff's motion is GRANTED.

The parties are directed to come up with a mechanism for addressing the issue of damages for Rosen's breach.

The parties are further directed to address the issue of Defendant's counterclaims. The parties should submit a joint briefing schedule by August 9, 2018.

The Clerk of Court is respectfully directed to terminate the motion at Docket Number 26.

This constitutes the decision and order of the Court.

Dated: August 3, 2018

Chief Judge

BY ECF TO ALL COUNSEL